## The Scotia.

(*District Court, E. D. Wisconsin.*   October Term, 1881.)

1. COLLISION—FAULT FROM WANT OF DUE VIGILANCE AND CAUTION.
   A schooner on reaching a point in the river dropped her anchor to await the arrival of a tug.   She was probably about 300 or 350 feet from the shore at the time, the channel at that point being about one-quarter of a mile wide.   While 'in this position, with her anchor light displayed, a tug, with an extensive raft of logs in tow, approached her from the north.   At about the same time a propeller entered the river under checked speed, approaching the tug, which had all its signal lights burning.   The raft in tow caught the anchor chain of the schooner and dragged her down the river towards the propeller, when a collision ensued between the propeller and the schooner, occasioned by the maneuvers of the propeller.   *Held*, that there was devolved upon the propeller the duty of exercising a degree of caution and vigilance commensurate to the occasion, and that under the circumstances of this case such caution was not exercised.

In Admiralty.   Suit *in rem.*

*George C. Markham*, for libellant.

*Cottrill & Cary*, for claimant.

DYER, D. J.   This is a suit *in rem* prosecuted by the libellant, as owner of the schooner J. O. Thayer, to recover damages for injuries resulting from a collision with the propeller Scotia.   The collision occurred in the Detroit river, off Bois Blanc island, at about 11 o'clock in the evening of October 25, 1875.   The facts, which may be said to be established by the testimony, are as follows:

The Thayer was making a trip from Buffalo to Racine, Wisconsin, and on reaching a point in Detroit river, near to or just above the head of Bois Blanc island, in the evening of the day named, dropped her anchor and awaited the arrival of a tug by which she might be towed to Lake Huron.   There is some dispute as to the distance from her place of anchorage to the island; but the weight of the evidence is that she was not lying in mid-channel, but was quite close to the island shore, probably from 300 to 350 feet from that shore.   The testimony shows that the channel at that point is about one-quarter of a mile wide.   There was a vessel lying at anchor above the Thayer, and another small vessel lying about 60 feet astern, and somewhat nearer the island shore than the point where the Thayer was at anchor.   While the Thayer was in this situation, with her anchor-light displayed, a tug with an extensive raft of logs in tow approached her from the north.   At about the same time the propeller Scotia, on a voyage from Buffalo to Chicago, entered the mouth of the river, and proceeded, under checked speed, on her course up the river.   The night was dark and misty, and there was a stiff wind blowing from the southeast.   The tug with the raft in tow, carried, in addition to red and green lights, two bright lights placed one above the other, indicating that she had a tow.   There were lights, also, on the raft.   As the tug approached the channel be-

tween the island and the Canada shore, she headed towards the latter shore, undoubtedly with a view to prevent the rear end of the raft, which would naturally swing towards the island shore in its passage down the river, from striking the vessels lying at anchor. The master of the Scotia testifies that he saw the green light and the two white lights of the tug about 15 or 20 minutes before the collision between the Scotia and the Thayer; and both he and his mate then supposed that they were the lights of a vessel lying at Frazer's dock, a point on the Canada shore opposite the island. The Scotia moved slowly up the river, until her master observed that the lights he had seen were on an approaching vessel. When the tug and propeller had got so close to each other that the escaping steam from the tug was discernible, the master of the Scotia blew two blasts of her whistle, indicating that he desired to pass on the starboard side of the tug. The tug responded with one blast, indicating that her master desired the Scotia to pass on her port or windward side. The master of the Scotia, however, adhered to his determination, and again blew two blasts of her whistle. The two vessels were then very close to each other, and the tug thereupon responded with two blasts. There is no doubt, I think, that the Scotia gave the first signal as the two vessels approached each other. The testimony on the part of the claimant tends to show that when the lights of the tug were first seen from the Scotia, the two vessels were about two miles apart; but, of course, it was difficult, under the circumstances, to form an accurate judgment of the distance. As the propeller and the tug passed each other, the master of the Scotia discovered the Thayer some distance ahead. The Scotia had been moving slowly, and when the Thayer was sighted, both engines of the propeller were stopped. Soon after this, the rear end of the raft caught the anchor chain of the Thayer, and dragged her some distance down the river, towards the Scotia. Either while the Thayer was thus being dragged, or after she had stopped dragging, and was again lying at anchor, she and the propeller came in collision. What is the fact in this regard is the question most controverted in the case. The witnesses for the Thayer testify that the raft had got free from that vessel, and had passed down the river when the collision occurred, and that while the Thayer was securely anchored, the Scotia, by three repeated movements ahead, struck the Thayer. The witnesses for the Scotia testify that, as the Scotia was beginning to back and when she actually had sternway, the raft was still dragging the Thayer down upon her, and that the collision was wholly occasioned by this fact; so that, according to the claim made in behalf of the propeller, the Thayer struck the Scotia while the latter vessel was retreating.

That the Thayer was in a proper place of anchorage I think there can be no doubt. The testimony of disinterested witnesses is that vessels bound up the river awaiting a tug, usually lie there. As before stated, she was not lying in mid-channel, but was sufficiently close to the island shore to leave a good passage on the Canada side. The master and mate of the Scotia, on sighting the lights of the tug, made a serious mistake in supposing that they were the lights of a boat lying at the dock on the Canada shore; and it is reasonable to

believe that if at that time, and even after, the Scotia had taken a course to the windward of the tug, the two boats could have passed each other without difficulty. But it is evident that the state of the atmosphere, the course of the wind, and the darkness of the night rendered navigation at that point somewhat difficult; and, if this were the sole point in the case, I should be disinclined to hold the Scotia at fault in taking a course on the island side of the channel; but, in the light of other facts in the case, I am of the opinion that she must be held responsible for the collision.

It cannot be well denied that both the master and mate of the Scotia knew, or should have known, when they saw the two white lights of the tug, that she was a craft with a tow; and it is somewhat surprising that they did not sooner discover that they were the lights of a moving boat. That such was the fact, does not, however, seem to have been known until the tug and the propeller were very near each other; so near that the master of the Scotia could see the steam escaping from the tug. It is true that the raft could not yet be seen, and it is also true that the Scotia was moving ahead with checked speed; but as the lights of the tug were seen when about two miles away, and as those lights were steadily approaching, and clearly indicated that the tug had a tow of some character, there may be ground for doubt whether, in view of the responsibility which the circumstances cast upon the propeller, those in charge of her took such precautions as were required, with due promptness.

Whether, as a proper precaution, the Scotia should have stopped and laid to as soon as the fact must have been discoverable that the lights of the tug were on a moving boat with a tow, or not, I am satisfied that in some of the subsequent maneuvers of the Scotia she was in fault. And, first, I do not think the facts and circumstances developed by the testimony establish the claim that the Thayer was dragged down upon the Scotia by the raft, and that the collision was occasioned thereby. It is true that the Thayer was dragged some distance down the river, and at least as far as the vessel that had been lying about 60 feet astern of her. But the principal witnesses for the libellant, who were on board the Thayer, testify positively that the raft was free from the vessel and had passed down the river, and that the Thayer was stationary when the collision occurred; and as they were on the deck of the vessel watching closely the movements of both the raft and vessel, they certainly had much better opportunity for observing, just when the two became disentangled, than had the master and mate of the Scotia, who were some distance

off, and had to make their observations at a distance and in the darkness of the night, and at the same time attend to the navigation of their boat. The circumstances, taken together, tend quite strongly to indicate that the collision between the Thayer and the raft was not of a serious character. It was not sufficient to impede the progress of the tug and the raft, for the master of the tug states that he was not aware at the time that the raft had struck the Thayer. No injury was done to the raft, as was found on examination after its arrival at Toledo, and I do not think that the contact of the Scotia with the Thayer, which certainly occurred more than once, is reasonably explainable on the theory that the raft was all the time foul of the Thayer and dragging her against the Scotia. That the Thayer did strike the vessel lying astern of her is true, but that would have a tendency to arrest her momentum and to separate her from the raft; and I think the circumstances tend to establish the conclusion that the Thayer came to anchor again near the place where the vessel which had been astern of her was then lying.

The master of the Scotia testifies that as he passed the tug he saw the Thayer. She was then at anchor. The raft had not yet struck her. The vessel was over 1,000 feet distant from the Scotia. The master of the propeller says also that he then saw the raft, and that he immediately stopped both engines of his boat and laid to. Now, I am strongly impressed with the belief that if this position had been maintained, or if the Scotia had then begun backing with both engines, the collision would have been avoided. At that juncture, when a vessel at anchor was lying ahead, and a tug, with a heavy raft in tow, was passing, there was devolved upon the Scotia the duty of exercising a degree of caution and vigilance commensurate to the dangers of the situation. *The Virginia Ehrman*, 97 U. S. 315; *Mills v. Steam-boat Nathaniel Holmes*, 1 Bond, 353. I am convinced that such caution was not exercised.

Concerning what was done the master of the Scotia testifies:

" I then saw the raft, and that it was very close to the Thayer's bow, and I think I spoke to the mate and said, 'I think there is room under that vessel's stern for us if we can get under there before the raft catches her.' I then put my wheel to starboard, and backed both engines and went ahead on the starboard engine, which had a tendency to slew the boat a little to the current westward."

He says further, that when he saw the raft strike the Thayer, he stopped the starboard engine and rang the bell to back, but that the raft dragged the vessel faster than the Scotia backed.

The mate of the Scotia also testifies as follows: "The captain asked me if I thought we could get under the stern of the Thayer. I told him it looked as though there was room enough. He said: 'I think we can get under there if the raft does not hook on to her.' I said I thought we could." Further, he says: "At the time the Scotia starboarded her wheel it looked as if the raft was going to strike the Thayer." The master of the Scotia further says: "I had made up my mind to go under the schooner's stern if the raft did not catch her; but I was pretty sure she would catch her, and she probably had made 100 revolutions, the port engine backing, and I then didn't stop the port engine, but rang to stop the starboard engine, the one that was going ahead, and rang to back as quick as I could between the bells so the engineer would understand it."

Thus it appears that after the Thayer was seen lying at anchor, and before the raft had struck her, but with the belief in the mind of the master of the Scotia that the raft and schooner would become entangled, he persisted in a maneuver by which he hoped to pass both the raft and vessel by going under the latter's stern; and to this, I think, in the light of all the circumstances, the collision must be fairly attributed. In other words, if the Scotia, when the position of the schooner and the raft with reference to each other was discovered, had backed with both engines, or had stopped both engines so that her forward movement would have been entirely arrested, my judgment is there would not have been a collision. The Scotia was under control, and when the situation was clearly one where danger was apparent, it was the duty of her master to withdraw his vessel from the position she was then in rather than to attempt the execution of a maneuver which brought the two vessels into even more dangerous proximity.

Decree for libellant.