## Philadelphia and Reading Railroad Co. *versus* Adams.

1. A row-boat is not within the "steering and sailing rules," embodied in the navigation laws of the United States, and a steamer is not bound to change her course for such a boat.

2. A steamer has a right to assume that such a boat is properly manned and equipped, and that the usual precautions will be taken and movements made by those in charge of her to escape collision.

3. The reason of the rule, that a steamer must change her course for a sailing vessel, because she has superior powers of locomotion to the sailing vessel, does not apply to a row-boat, which has adequate means of locomotion to enable it to avoid a collision.

4. Where a steamer collided with a row-boat, it was error to instruct the jury "that the accident which could excuse the party who committed the injury must be such inevitable accident as human foresight under the circumstances could not have prevented."

5. Although the court by affirming a point has stated the measure of damages correctly, it was error to again refer to the matter in the general charge in such a broad way as could only have been received as an intimation that the damages were to be assessed without any rule of law whatever.

February 3d 1879.   Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Error to the Court of Common Pleas, No. 3, of *Philadelphia county :* Of January Term 1878, No. 189.

Case by Lena Adams against the Philadelphia and Reading Railroad Company.

The *narr.* contained a single count, and alleged that Frank Adams, plaintiff's son, was in a boat on the Delaware river, and was rowing the same in a careful manner ; that defendant had a steamship called the "Leopard," under the care of its servants ; that the defendant took such bad care thereof that it ran foul of and struck said boat, whereby said Adams was thrown into the water and was drowned.

Plea, "Not guilty."   The trial was before Finletter, J.

The facts and legal questions raised are stated in the opinion of this court.

The verdict was for the plaintiff, for $2700.   The railroad company took this writ of error.

*Thomas Hart, Jr.*, for plaintiff in error.—It was error to instruct the jury that to relieve from responsibility the accident must be such an one as no human foresight could prevent.   This rule is too stringent.   Inevitable accident is that which could not have been prevented by the exercise of ordinary caution and maritime skill : The Virgil, 2 W. Rob. 205 ; The Marpesia, L. R. 4 P. C. 212 ; The Europa, 14 Jurist 629 ; Kelsey *v.* Barney, 12 N. Y. 425.   The admiralty rule, that a steamer shall keep out of the way of a sailing vessel, certainly does not apply to a row-boat.   The

reason of the rule is that a sailing vessel has not the same means of locomotion that the steamer has, and that the latter must therefore give way to the former; but there is no occasion for a steamer to avoid a row-boat, whose course can readily be changed: 1 Parsons' Ship. 566; Lockwood v. Lashell, 7 Harris 344; Trinity House Rules of 1840; City of London, 4 Notes of Cases 40; Ward v. Armstrong, 14 Ill. 283; Pearce v. Page, 24 How. 228; Bigley v. Williams, 30 P. F. Smith 107; Holmes v. Watson, 5 Casey 459; Beck v. East River Ferry Co., 6 Robertson (N. Y.) 82; Ince v. Ferry Co., 106 Mass. 149; Beach v. Parmeter, 11 Harris 196; Grier v. Sampson, 3 Casey 183.

A steamer is not required to take precautions when there is no apparent danger: The Scotia, 14 Wall. 170; or to slacken her speed until a collision is imminent: The Scotia, *supra;* The Free State, 1 Otto 200; Beck v. Ferry Co., *supra.*

It was to be supposed that the boat would move out of the steamer's way. The steamer had the superior right of navigation, even had the men in the boat been exercising the right of navigation: Cobb v. Bennett, 25 P. F. Smith 326.

The instruction as to damages was too broad: Railroad Co. v. Books, 7 P. F. Smith 339; Railroad Co. v. Kelly, 7 Casey 372; Railroad Co. v. Ogier, 11 Id. 60.

*James D. Lee* and *Pierce Archer, Jr.,* for defendant in error.— Steamboats having means to avoid injury which other boats do not possess, the law exacts of them exertions proportionate to their powers: Holmes v. Watson, 5 Casey 457; The Tug Sampson, 3 Am. L. Reg. 337; s. c. 11 Pitts. Leg. Jour. 183.

British Orders in Council, or Trinity House Rules, do not control American vessels in our waters: The Scotia, *supra.*

Mr. Justice WOODWARD delivered the opinion of the court, May 5th 1879.

A collision occurred on the afternoon of the 3d of July 1876, between the steam collier "Leopard," belonging to the defendants below, and a row-boat in which there were four young men, of whom Frank Adams, the son of the plaintiff below, was one. The steamer was going down the Delaware river, on an ebb tide, at a rate of speed variously stated as from eight to twelve miles an hour. The boat was near the middle of the river, between the city of Philadelphia and the New Jersey shore, when the steamer approached it. Two of the men in it, one after the other, went into the water to swim. John Trapp was swimming when the steamer was first seen. From this point the testimony was conflicting. That of the plaintiff was to the effect that when the steamer was within fifty or sixty yards of the boat the men in it tried to get away, but could not do so on account of the tide. That of the defendants tended

[Philadelphia & Reading Railroad Co. v. Adams.]

to show that no effort at all was made to move from the channel in which the steamer was coming down. It would seem that the boat was managed with difficulty, and that there was a deficiency of oars. As the steamer reached or was about to reach them, the men jumped into the water, and Adams and Casper Werner were drowned. There was testimony that the boat was abandoned at the instant of the collision, and there was testimony that it was abandoned when the steamer was ten or fifteen feet distant. This suit was brought by the plaintiff to recover damages for the injury caused her by the death of her son. The exigencies of this judgment do not require that the facts developed should be analyzed, or even detailed. The discussion will be confined to what appear to be the vital legal points raised on the trial and argued here.

In the second point of the counsel for the defendants, the court were asked to charge: "If the jury believe that when the boat in which the men were was first seen to be in the steamer's way, the captain of the steamer whistled and changed his helm, and successively stopped and reversed his engine, this was all he was bound to do, or could do, to avoid collision, and although the steamer, whether from her momentum or from the tide, may not have been able to stop still before reaching the boat, the defendant's servants were not for that reason negligent, and the verdict should be for the defendants." The point was peremptorily refused. It was defective, perhaps, in the absence of a single qualification. The plaintiff had alleged in part of her case that the captain had not kept an adequate lookout. In connection with the answer to this point, it is necessary to examine the grounds of other errors assigned by the defendants. The jury were instructed in the answer to the plaintiff's tenth point, that "if the steam vessel had a proper lookout and a man at the wheel, they were bound to have seen the sailing boat in their path, and if they did see it and continued on their course without changing or stopping the vessel, it is evidence of negligence on their part," subject to the qualification, "if the jury," in the language of the court, should "find the facts mentioned contributed to the accident."

In answering the plaintiff's twelfth point the court ruled that "if the steamer did see, or ought to have seen the sailing boat in time to avoid the collision, and did not avoid it, she was guilty of negligence, and the verdict should be for the plaintiff." The thirteenth point, that "if the steam vessel did see, or could by a proper lookout have seen the row-boat a square off, and if that was distance sufficient to allow her to change her course, or stop so as to avoid collision, she was bound to do so, and failing to do so, she was guilty of negligence;" and the fourteenth point, that "the effort to stop the steamer, if not made soon enough to be successful, if she saw or ought to have seen the row-boat, will not excuse such negligence," were also affirmed. The errors in which these rulings

8 NORRIS—3

are specified present the most prominent question to be considered. The fifteenth assignment alleges error in the refusal of the court to affirm the sixth point of the defendants, " that it was the duty of those in charge of the row-boat to keep out of the steamer's way," and as the evidence showed " they did not do so, the plaintiff could not recover." The point assumed the ability of the crew of the boat to move. The plaintiff alleged that the men were not able to get out of the channel ; that the captain of the steamer ought to have regarded this inability ; and that it was for the jury to say whether the boat could have been moved or not.

Were the men in the boat within the protection of the " Steering and Sailing Rules" embodied in the navigation laws of the United States ? That as between a steamer and a sailing vessel, the steamer shall give way and the sailing vessel shall keep its course, and that as between sailing vessels, one that is going free shall give way to one that is close-hauled, are regulations corresponding with well-settled regulations for the use of public highways on the land. But does a steamer owe any such duty to a row-boat ? As usually equipped and manned, such a boat is moved with greater facility and is more within the control of the crew than the steamer itself. The collier of the defendants was in the channel of the Delaware for the purposes and in the prosecution of a lawful business, and had the right, in absence of conditions creating duties to others, to maintain its course. Ordinarily, the crew of a row-boat can remove it from the track of danger by a movement or two of its oars, and in scarcely an appreciable interval of time. The captain of a steamer passing down the channel would have the right to assume that the boat would be equipped in the usual way, and that the ordinary precautions would be taken and the ordinary movements made. A crippled condition of the boat, inadequate appliances, or the inability of the crew to escape collision, shown to have been known or apparent to the captain, would change his relations and responsibilities at once. But is it possible that the bare fact that the boat was in the channel required that the course of the steamer should be altered or its speed checked before it became manifest that the danger of collision was impending ? Principles have long been settled which are inconsistent with those under which this cause was tried. It was declared in Cobb *v.* Bennett, 25 P. F. Smith 326, that a vessel may hold her course in a navigable stream without regard to a fisherman's net, if the master acts without wantonness or malice; and that while the right of fishery is acknowledged, it is subordinate to the right of navigation. In Beach *v.* Parmeter, 11 Harris 196, damages were claimed for injury to the leg of a horse produced by collision with a buggy which, in passing the horse, kept its course in the beaten track of the highway. It was said in the opinion here that " where a road is narrow, and there is difficulty in passing, if a horseman can turn out without danger to himself or beast, and the buggy cannot be turned

without incurring danger, it is the duty of the former to give way." And in Grier v. Sampson, 3 Casey 183, it was held that while it is the general custom in this country for persons meeting on a highway to pass to the right, yet when a horseman or the driver of a light carriage meets a heavily laden team it is his duty to give way and leave the choice of the road to the more unwieldy vehicle. The cases of the "Scotia," 14 Wall. 170, and of the "Free State," 1 Otto 200, decided that it is the duty of a steamer to keep out of the way of a sailing vessel; that this duty implies a correlative obligation on the part of the sailing vessel to keep her course, and to do nothing to mislead; that the steamer is required to take no precautions when there is no apparent danger; and that where a steam vessel is approaching another vessel, and where a collision might be produced by a departure of the latter from the rules of navigation, the former vessel is not bound to slacken her speed, or to stop and reverse. Up to the moment when the captain of the "Leopard" had reasonable ground to apprehend a collision, he was not bound to change his course or to take other precautions to protect the boat from a danger which it must have seemed entirely practicable for the crew to avert.

In the fourth assignment of error complaint is made of the affirmance of the plaintiff's sixth point, "that the accident which will excuse the party who committed the injury must be such inevitable accident, as human foresight, under the circumstances, could not have prevented." Just how deeply into the minds of a jury such an instruction might have struck, can only be conjectured. It was an unfortunate use of terms, although their misleading tendencies may have been modified by the qualifying phrase "under the circumstances." The jury would have been warranted in rendering a verdict for the defendants, if they had found that the "accident" had occurred notwithstanding the careful, prudent and energetic use of all needed appliances by competent, earnest and faithful officers. To hold one whose act has injured another, excusable only when the "accident" was one which the keenest human intelligence could not anticipate, would be to carry the law of negligence far beyond the rule which demands due skill, prudence, care and diligence proportioned to the requirements of a particular emergency. In Beach v. Parmeter, supra, the president of the Common Pleas had charged that the defendant was not liable "if the collision was entirely accidental," and if the injury was "the result of the accident." It was said here, in affirming the judgment, that the judge "must have meant inevitable accident, such as no human foresight could avert." Applied as the words were in that case and to its circumstances, they could, perhaps, neither help nor hurt, but it is believed that as a formula for the instruction of a jury, its adoption would prove to be always unsafe.

In the plaintiff's twentieth point, the measure of damages was defined with accuracy, and the point was affirmed. But in the

[Philadelphia & Reading Railroad Co. *v.* Adams.]

general charge, the subject was referred to the jury in the broadest possible way. The court said: "It would be impossible to fix any rule or standard by which damages of this kind could be estimated. They depend upon conditions of life * * * of which the jury will know about as perfectly, * * * no doubt as any lawgiver, or any one whose duty it is to instruct the jury on the purposes of the law. Whatever it may be, it should be governed by a disposition * * * to arrive, if possible, at a fair compensation, and to do right between these parties, just as each of us would expect under like circumstances, if our cause should be viewed and judged by a jury." This could only have been received as an intimation that the damages were to be assessed without the application of any rule of law whatever. In the Pennsylvania Railroad Co. *v.* Ogier, 11 Casey 60, the question of damages was submitted to the "fair and reasonable discretion" of the jury, "based upon the law and the evidence." Latitude at least as great, was given here, as was given either in Railroad Co. *v.* Kelly, 7 Casey 372, or in Railroad Co. *v.* Books, 7 P. F. Smith 339, in both of which cases the judgments were reversed for errors in unguarded instructions relating to assessments of damages.

Without detailed reference to the fifteen assignments of error, what has been said covers the essential points of controversy in this cause, which are believed to have been improvidently determined.

Judgment reversed, and *venire facias de novo* awarded.